On behalf of AF1, Mr. Donald J. McNeil. On behalf of the AF3, Mr. James M. Kelly. Mr. McNeil, you may proceed. Thank you, Your Honor, and you may please report. I'd like to spend just a minute setting the stage here and introducing you to the partners, because both counsel and I are going to be talking about these folks for a while. This Courtesy Manufacturing Company, which is a manufacturer or was a manufacturer of metal components, made to the customized specifications of its customers. What Courtesy would do is assemble parts made by others and by itself and produce a finished product for its customers to sell. In July of 2005, Courtesy entered into an agreement to supply certain components to a startup venture known as UPWT. That company had developed a machine called the Ice Island, which they thought would be quite successful. This is a machine that would, instead of going to the convenience store or to the food store and buying ice that was trucked in by Jefferson Ice Company, these machines would make the ice in a component of the topping machine, back it, and then put it into a freezer, in effect, on the bottom, where customers could come and buy the ice. Mr. McGill, just let me interrupt one second. You have a motion to substitute as counsel for this client, and we're going to grant that motion. Thank you, Your Honor. So the type of product this was would only be successful in a commercial way if it could be sold to chains like 7-Eleven, Safeway, Jewel, Dominix, or whatever, making one or two of these a year, and I can make a lot of money. But if a chain that now had an ice supplier, like Jefferson Ice or whatever, went to this particular machine, they would probably buy 3,000 or 4,000 at a time. And that was the business model going into the relationship between the parties to this case. This is really a case about failed expectations. When the purchase order that's at the heart of this case was issued, everyone, UPWT, courtesy, and the plaintiff in this case, American, thought that there would be enough ice silently sold to support the manufacture of 4,000 component units by American. American was going to make the bagger or part or the components of the bagger that would put the ice in the bag and deliver it to the freezer at the bottom of the machine. Both Lewis Golden, Jr., who was courtesy general manager, and Mark Keller, American's president, knew that no bank would lend American the money to purchase machines it would need to make these components unless American could show lenders a firm order that would generate enough cash to pay off its loans. And American did not have the capacity to make the anticipated 4,000 units over the course of a year. It had to buy two large machines, the total price of which would be in excess of $700,000. No collateral, and Mark Keller, American's president, and Mr. Golden, the general manager, courtesy, talked about that, and what they decided to do was to issue the purchase order in question here and to draft it in a way that made it appear that there was a guaranteed contract. Because as both of them testified, a banker's not going to lend money based on a blanket order. But in fact, what they both understood at the time was that this was a blanket order. A blanket order is an order in which— Their intent was the question of fact, wasn't it, Gordon and Kellers? At the very least, it was a question of fact. And, of course, we're here today in a case in which the court granted summary judgment to one party. And who decides the question of fact? If there was a question of fact, it should be the jury that decides it. It's then the judge took away questions of fact like the one that you mentioned and decided them itself. Yes, so it is the trial court that decides it, but it's the trial court's jury that decides it when there's a genuine issue as to the material facts of the case, as there are here. Didn't the trial court find there was no material issue of fact because the evidence, the judge used an unusual term. The trial court found— It was extremely minor so that it didn't amount to a relevant or disputed fact. The trial court found that there was no genuine issue of material fact, in part because the court found that the contractor that purchased it here was unambiguous and it applied a parole evidence rule. Let me stop you right here. I just received this motion, unopposed motion for substitution of counsel. The motion also includes withdrawal of the firm with which you work. Right. And the Supreme Court rules provide a certain method of withdrawing this counsel. We may not approve the representation. That provides notification of the client by, I believe, certified mail. And, of course, this motion doesn't comply with that. That's only when the driver— When the driver proceeds as—I assume you talk to your client and your client agrees. I think the rule actually does not apply, though, when there's no break in representation by the attorneys. When the same attorney flows through— It's basically a substitution if the same attorney, but just like that one. I moved, basically. And I think in that case, 341 doesn't apply. So this motion apparently moves for the firm's withdrawal, as I read it. And you're right that with respect to representation, it's one attorney that represents from the firm that represents the client, not the firm. So in that case, proceed. Okay, thank you. There are genuine issues of material fact in this case, not only as to the intent of the parties with regard to the contract, but also as to the authority of Golden, the general manager, courtesy, to enter into this agreement. What we're talking about here is his authority, remember, to enter into an agreement that, according to the plaintiff, bound courtesy to pay $2.8 million for components that were unique, that could only be used in ice islands, even as it never got any orders from— Counsel, let me interject. Is the issue his authority to enter into the contract, or is the issue from a legal standpoint his apparent authority? It boils down to apparent authority, because the plaintiff doesn't allege or doesn't claim, at least in its briefs, that he had actual authority. And I think there's a genuine issue of material fact as to that. Because the president of courtesy testified that he, in fact, gave Golden a memo saying that he did not have the authority to enter into arrangements worth more than $50,000. But you don't have to look at that issue, because you're right, apparent authority— It boils down to apparent authority. The actual arrangement between Lombardo and Golden doesn't bind the plaintiff. It's a matter of fact that there's apparent authority. Right. And in this case, we say there was not. Because one of the important elements of apparent authority is that the party that's alleging apparent authority has to show that a reasonably prudent person, exercising diligence and discretion, would assume that the agent, rather, in this case Golden, has the authority in light of the organization's conduct. In other words, American would have to show here that courtesy did something to lead American to believe that Golden had the authority to commit to $2.8 million, even if there were no orders. Well, it's undisputed Golden was the general manager. Yes. But not at the time that he negotiated this deal. Right. But it is also undisputed that the president of the company, Guy Lombardo, was in terms of the chain of command above him. Well, how would the plaintiff know that? He would know that because he knew both of them. They negotiated this contract over several months. But he certainly knew. In fact, he testified in his deposition that he understood that Lombardo would have to approve the contract. However, he also understood. Golden testified, as I recall in his deposition, that he believed he had the authority to sign this purchase order on behalf of the defendant without restrictions. Yes. He further testified it was after the purchase order was issued that Lombardo indicated he couldn't approve orders in excess of $100,000. But wasn't that in point of time after the negotiations with the plaintiff? That all goes to the actual authority point on which we agreed. You don't need to reach that because really the case revolves around the parent authority. Right. And one of the points we make here is that no one, no reasonable person, would believe that the general manager of a company has the authority to buy that company to pay for 4,000 items, a total of $2.8 million, if there are no orders for the components that are being made. These were unique components. This wasn't an assembly that could be used in anything other than an ice island, and there were no orders. So you're saying that if a party is dealing with the general manager of a company, they've got to presume that the general manager has certain limitations in negotiating? Is that what you're suggesting? The case that we cite actually says that almost regularly. I'm quoting now from Global Poly Inc. v. Fred's Inc., a U.S. District Court case. Plaintiff argues that if the alleged agent was the purchasing manager, then he necessarily must have had the implied authority to set whatever terms of purchase he wished. That may be a permissible inference, but it's not the only permissible inference. A jury might reasonably conclude, upon hearing all the evidence, that the alleged agent had authority to make purchases, but that there were limitations on that authority. The limitation here, though, I think is one that would exist in any case. The contract that is alleged here is one that no reasonable person can believe anybody has the authority to issue. What the plaintiff alleges in this case is that there was a guarantee. He got his $2.8 million even if he didn't make one bank or assembly. In fact, he only made about $100. All right, well, let me ask you more to the point. There were affidavits filed here, obviously, in support of the motion for summary judgment. Does that ring a record? The affidavit that was filed by Lombardo, who would be the only party that could establish there was no authority for Golden to negotiate this deal, his affidavit was silent. Silent regarding Golden's authority or alleged act thereof. What's your assessment of that? If he didn't have it, why didn't the affidavit say he didn't have it? Because the verified complaint that he signed said it didn't have it. And verified complaint, in essence, serves the purpose of an affidavit. The affidavit that he submitted was only to supplement the allegations of the verified complaint. Talk to us about your affirmative defenses that were stricken. Well, I guess the initial point to make is that the affirmative defenses were all stricken, as were our counterclaims, on the basis of the parole evidence rule. And both as a matter of fact and as a matter of law, we think the trial court erred with regard to its interpretation of the parole evidence rule. The parole evidence rule prohibits the introduction of evidence to contradict the terms of an integrated contract. In this situation, we had a significant ambiguity. It was an ambiguity as to the very heart of the case. It was an ambiguity as to the delivery terms. There's no dispute that pursuant to this blanket order, a American would have had to supply and courtesy would over time have requested 4,000 units. There's no dispute about the price of those units. But there is a dispute as to the delivery terms. It's our position that the words that were incorporated into the purchase agreement, words that Mr. Keller himself wrote, words that were in a quote that was attached and incorporated by reference, said delivering 100 units as instructed. I just want to see if it was 100 units per week as instructed. The phrase as instructed in the context of this case, both Golden and Keller's testimony supports the view that what it meant was as instructed by courtesy or as needed. Obviously, they were not going to be filing up thousands of components from a machine that was not being built. Well, let me ask you this, then. If you interpret the contract such that the defendant is only required to place orders as needed, wouldn't it render the provision of the contract stating it's a 12-month usage for 4,000 units meaningless? That phrase, you know, honestly, there was no explanation by Keller who drafted it as to what that phrase meant. But in the context of this case, what it appears to have meant is that the quote itself was based upon receiving within 12 months 4,000 orders. There are economies of scale. And when they did the quote, one of the assumptions of the quote was that there would be 4,000 units per year. That was not made a term of the agreement. As needed, you could also make the argument that how do you really have a contract because one party isn't really bound. But this is a common business situation, an as-needed contract, where you're looking for a supplier to make sure that if you are successful in selling your machines, there's a component supplier out there. And you line up one or more component suppliers. They lined up American as a component supplier. They said, when we get the orders, they're yours. You're going to make the bagger assembly. Then they get the orders. Then why do you have the reference of 4,000 units? Why don't you just have a contract as needed? Well, part of the reason was because Gold and McKellar, according to our counterclaims and affirmative defenses, conspired to mislead the bank. And then when the whole shebang went up in smoke, conspired to come before the circuit court and before this court and represent that this was an unambiguous guaranteed contract. That was never the intention of the parties. And there again, the trial court would be aware that this is more than sufficient evidence to support an inference that that's exactly what happened. Yet the court— You're tying this up, but what specific facts do you rely on to prove the conspiracy between Gold and McKellar? Well—  Well, probably the most significant fact that shows not only the possibility of a conspiracy here, but the intent of the fraud, is that the contract itself, in the context of this case, that Gold and—or rather, that McKellar and American received $2.8 million, even if not a single item was delivered. In fact, the judgment of the circuit court awarded American $1.7 million for 3,900 units that were never delivered. Our point is that that's the type of contract where one can infer that there was a conspiracy, that there was a relationship between Gold and McKellar that was in some ways unholy, because why else would the contract be so one-sided? Gold was an experienced manager. He'd been in the industry for over 25 years. He signed a contract that provided a 75 percent profit when he testified that the average in the industry was 5 to 7 percent. We sued him, as a regular reference. We sued Gold for tortious interference, breach of fiduciary duty, et cetera. The effort here was that the court took all those claims away and said, because of the parole evidence rule, that they should be thrown out. Well, to manufacture the parts with respect to, let's say, the 4,000 units, did not the plaintiff hire an additional staff, make substantial revisions in the factory, make arrangements with subcontractors to provide specific tools and equipment to manufacture the parts needed? The business put itself in a position, it spent some money, for sure, it put itself in a position to be able to fulfill the contract. Which meant 4,000, correct? If Courtesy needed the 4,000 units, then America was committed to providing you 4,000 units. That's what the purchase order said. But in an as-needed or requirement-set contract, you deliver as the orders come in from the ultimate customer. The ultimate customer is UPWP. If they call up and say, great, we've got safeway, we need 4,000 units, then those guys are hustling right away. What happened was they made some preliminary steps toward having that capacity, including the buying of those two machines. They still have the two machines. At least they did when we left the trial court. They made permanent improvements to their business in anticipation of something happening that didn't happen. But they've still got a more valuable business today. They have the capacity, if another deal like this comes along, to fulfill the requirements of that deal. Thank you. Thank you. Good morning, Your Honors. May it please the Court, I'm James Allen, appearing on behalf of America in this matter. Your Honor, your son, the case primarily boils down to the defendant in this case wanting the court to sanction, asking the trial court, now asking the Second District Appellate Court, to pass the risk of UPWP contracting down to America. And it's not proper. Was it contracted with, between the parties? They're the ones that should bear the risk of UPWP not ordering the isolated units from them, not America. From our perspective, we believe it would be a very straightforward case. We have a clear contract. If you would, on the apparent authority argument, why do you think there's no disputed question of fact? There's no disputed question of fact that's found by the trial court on the apparent authority because you have Mark Keller dealing with Lou Golding, the general manager of Curtis. Not only was he general manager, but he also supervised the department heads within Curtis. He was a primary person that Mark Keller dealt with and is undisputed pursuant to the record that, and the deposition of Lou Golding himself, he was the one put in charge to head up this project. He was the one put in charge to get America on loop. And I believe he indicated in his deposition that that was the direction from Guy Lombardo. Mark Keller had very little dealings with Guy Lombardo. The dealings with Guy Lombardo primarily occurred in the summer of 2006 after he had got his lawyer. Lombardo authorizing Golding to act on Lombardo's behalf would be direct authority. Now, the court found apparent authority. Yeah. So continue with your reasons why apparent authority is prudent. Well, the, once again, it was the title held by Lou Golding, the dealings with Mark Keller, and the deposition testimony of Lou Golding where he indicated that he was given the authority by, and I know it transcends, I think it transcends actual and apparent authority, but he was provided the direction from Lou Golding to get America on board. That's what Mark Keller thought he was doing. He was dealing with a general manager of courtesy. And not only did, I guess, I started to get into the purchase order. That purchase order is clear, but it's signed by Lou Golding. But not only is he signed by Lou Golding, it's signed by another purchasing agent, Maria, I believe it was Maria Melendez. So sitting in Mark Keller's position, he's got a purchase order that he's negotiated with Adelaide from Lou Golding, the general manager. That's not only signed by him, but signed by another from courtesy. After that, they perform, at least from my client's standpoint. He gears up. He spends hundreds of thousands of dollars in reliance on his purchase order. Delivers them inspection units multiple times. For a four or five month stretch, I'm not sure, where he's trying to perform and trying to get them to order under the purchase order. And it wasn't until Guy Lombardo's statements to him that, and once Lou Golding was out of the picture, that Lou Golding didn't have the authority to do that. We didn't mean to issue 4,000 unit orders. We'll continue to deal with you, but not under the guise that there's going to be a 4,000 unit purchase order. How long after the purchase order was signed by the two parties did Lombardo communicate that apparent restriction to Keller? I believe that was the, we have a February 2006 purchase order. I believe that came the end of June or first part of July 2006. So several months later. Several months later. Four or five months later. What is your response to his allegation that the reason that the contract was written up like it was, was to basically mislead the bank into giving the money? Well, I agree with what the trial court indicated in its opinion on this, that that bends credibility to its max. What the defendants are trying to say here, and they did this on the 11th hour, we were fully briefed on the motion of a summary judgment. They filed a motion to amend over our objection and obtained leave to file an amendment complaint. What they're trying to establish and trying for the, not the appellate court to, to agree with is that my client purposely negotiated with and contracted with a general manager who didn't have any authority to contract for 4,000 units that may or may not come. Because my client wanted to go to the bank and obtain financing to purchase hundreds of thousands of dollars worth of equipment. It's ridiculous, your honors. It, there's not one fact, other than conclusory facts, and, and, that they pledged in the complaint to support such a proposition. There's simply nothing there. We have the deposition of Lou Golden where he says, no, we, we're, we intended to issue this 4,000 unit purchase order. So I would go back to the trial, I, I wholeheartedly agree with what the trial court here said, that that's bending credibility to its max. There were no facts to support their, their, their allegations in their, in their comment. Counsel, going back to another threshold question, one would be the apparent authority. The other issue would be the issue of the contract interpretation opposing counsel's argument. Clearly, the intent here, or at least it's a question of material fact, that the intent was to place orders as needed. What's your response as to why there was not an ambiguous provision here? Well, it's not ambiguous because when you read the purchase order, and the quote produced by Mark Calrad as a, as a whole, clearly indicates a, a purchase order for, for 4,000 units. The, the purchase order references a quote which states that the quote is for a 12-month usage for 4,000 units. There's a delivery schedule. 25 units by May 8th, 50 by May 15th, 75 by May 22nd. That left 3,850 units to be, to be delivered at the rate of 100 units every week as instructed, but over the remaining 49 weeks of the 12-month usage. No other meaning of the term as instructed would, would make the phrase 12-month usage, usage coherent. These were priced, the 4,000 units were priced based upon $700, $701 per unit based upon a 12-month usage. I believe- So you're saying what would be the point of having a time limitation in the unit amount if it's strictly as needed? Is that sort of what you're saying? Well- Or what are you saying? Is it inconsistent? Is it, does it contradict each, each term contradict each other? Well, I, the, the 12-month usage versus the as, as instructed, it, it, I think it goes hand in hand. I think they tie together. You know, it could have been worded better, possibly, but the, but we believe and the trial court believe it was fairly clear based upon the, the language of it, of both documents and the, and the dealings between Mark Keller and Lou Golden that- In other words, he had 12 months, 12 months for 4,000 units. It has neither referring to, yes, Lombardo's company will order them as they needed, as needed. However, within the parameters of 12 months and 4,000 units. Yes. It doesn't direct them to buy 200 in one month. They have a year. They have 4,000 units. They decide when they want delivery of these machines. Within the year. Within the year. Is that basically what you're saying? But that's basically, I mean, you, you had some upfront markers to hit by specific dates, 25 by May 8th, 50 and 75, and 100 units every week thereafter as instructed over the remaining 49 weeks. Within 12 months, this quote was quoted for 12, a 12-month usage. My client certainly intended to be that. My client, if it thought there was only a guarantee for 150 units, wouldn't have gone out and spent hundreds of thousands of dollars gearing up and ramping up its company. And there's no dispute that Lew Golden knew that. Lew Golden knew that two pricey pieces of equipment had to be purchased in order for this, in order for America to fulfill and honor the contract. Lew Golden knew that we had to hire employees to gear up and honor this contract. Your Honor, if I could just touch again briefly on the issue of the counterclaim. Again, we sought dismissal of it with prejudice under 2619-9, asserting that there was affirmative manner negating the cause of action completely. It's not, and I don't want to make sure this point is clear. It wasn't just a simple parole evidence argument that we're making. We certainly made that argument to stay within the four corners of the document because we thought it was clear. But also, there was clear facts here with respect to the fact that the easily set of proven facts and what they were trying to establish, this didn't make sense. That they're trying to establish that Mark Keller would purposely enter into a contract he knew had no validity in order to get bank financing simply lacked merit completely. I would like to talk about damages. I know it wasn't discussed up front. We had a trial on damages, and Mark Keller was the principal, actually the only witness. He explained his methodology. The court accepted that methodology and entered a judgment for a American amount of $1,712,649.87. The appellant spent some time in his briefs attacking that damage report, indicating that it wasn't mathematically accurate. Indicating that possibly the bank American missed some figures or miscalculated figures. The trial court heard the testimony of Mark Keller multiple times, determined it to be highly credible. Though the trial court indicated there may have been a couple errors here, nothing of significance entered the award it entered in the case. And pursuant to the Getschall case, for instance, Continent First District 1982, you don't have to have mathematical certainty when you're trying to prove lost profits. The trier of fact has broad discretion in establishing an award of lost profits, and its decision will not be set aside on appeal unless manifestly erroneous. And there's no dispute between the parties as to how you reach that calculation. You take the lost profits, you take the cost of producing the units, which in this case was primarily labor. Because the materials were being provided by the courtesy of this case. It was primarily labor, and then some outside costs of third parties. And combined together was around $245.01 per unit. You take that versus the 701 figure, and that's how the trial court came to its conclusion here. All that is required in this pursuant to the Getschall case, all that is required is that the court use a reasonable basis for computation. And such a reasonable basis shall be sufficient to establish damages, even though the result is only an approximate amount. The American above and beyond in this case, it also provided a substantial offset for the work it could run on the machines. It had two idle machines sitting there. They ran work on it and gave it a sizable reduction off of that amount. When issues came up with respect to some of the minor issues that the court noted in the calculation of the lost profits, American proposed, and the trial court accepted, doubling its labor cost of its permanent employees. That increased the per unit cost for American to do this roughly from $201 to $245. The trial court found that to be reasonable, a reasonable way to correct any minor deficiencies in the lost profit calculation and reached its determination that the American had titled it $1,712,649.80. That's all I have. If there's any questions. Thank you. Thank you, Your Honor. I would ask the court to keep two things in mind as you deliberate over this case. What is the procedural question? You're reviewing de novo, a grant of summary judgment. The issue before you is not whether the plaintiff is right or the defendant is right with regard to the summary judgment. It is whether or not there is a genuine issue, a material fact. The facts that are disputed in the case should have been decided by the jury instead of the judge. Don't we need to get to the proper or improper ruling on your affirmative defenses before we would get to the procedural part with respect to summary judgment? You could, for example, I think, go to two of our affirmative defenses and rule on those alone. Not only that there shouldn't have been summary judgment for the plaintiff, but that there should have been summary judgment for the defendant. Those two affirmative defenses are the failure of presupposed conditions and commercial frustration. Those doctrines here, we think, entitled the defendant to a judgment. The commercial frustration document is one in which a party is excused from performance because of the contingency, the non-occurrence of which was a basic assumption in which the contract was made. It's undisputed here that everybody assumed when they entered into this contract that there would be 4,000 units ordered by UPWT. In fact, there were none. From that day to the day we left the trial court and came here, there was not one order for an ICE item. And that's also relevant, of course, to the likelihood that Golden had apparent authority. Would a reasonable person, an experienced business person, enter into a contract like this unless there was something funny going on? Again, it's very interesting. Let me interject another thought on that because you said, well, it seems to be some sort of a common knowledge, perhaps, that given the magnitude of this order, anybody would know that you would have to go beyond Golden, the general manager. Well, what about Ms. Melendez? It isn't just Golden that signed this. There was another employee. So if it's such great common knowledge and courtesy that this is beyond the authority of anybody, how come Melendez apparently didn't know it? Well, she's a clerk. She reports to Golden, and she and Golden and Keller are in a room with a closed door. Well, you're back to the conspiracy argument. That's what happened. Those are the undisputed facts. Did somebody give that to Melendez? She conspired with Keller and Golden? No. She signed it because her boss said sign this purchase order. We're going to buy 4,000 units. She's not at a level of a company that makes decisions like that. She's simply signing it on behalf of the purchasing department. Remember, we don't dispute the validity of the purchase order with regard to the fact that, indeed, courtesy was obliged to buy Ice Island components from America. They were obliged to pay the prices in the purchase order. The only thing we disagree about is we say there's a genuine issue of material fact with regards to the delivery schedule. And that is critical also to another point that we raised in our brief, which is whether or not there was a breach here. Well, let's go back to one other question I want to ask because I had a different perspective on it. The contract specifically states it's for 12-month usage for 4,000 units. Do you dispute that? We dispute that that was a part of the contract. If you look at the purchase order, which is on page 8117 of our appendix, it says, delivery as per quote, and it's the only reference to the quote. The next page, A118, is a handwritten draft on which the following words appear, terms, colon, as per quote. Per quote is crossed out, and substituting for as per quote is as above. It's our position that the 12-month usage was not a material term. It wasn't a term of contract at all because the only thing that was incorporated by reference to the purchase order were delivery terms. So what did courtesy obligate itself to do, in your opinion? They obligated themselves to get every bag of assembly they needed from this company, from America. That's it. So if they didn't need to order anything, they're not obligated to order anything. If they didn't make a statement. They would be excused from performing under the contract. The two doctrines I just mentioned, commercial frustration and failure of presupposed conditions, because those doctrines say if something terrible happens, then no one would have anticipated, and especially with regard to a basic assumption under the contract, that you're excused. The case goes back to the case where somebody rents a room for the coronation of Edward VII, and Edward VII doesn't get coronated or he doesn't get crowned. He doesn't have to pay for the room. The reason he doesn't have to pay for the room is that when Edward VII gets over his appendicitis and goes through his coronation, at that point the landlord will make his money. So general downturns in the market can't be anticipated. That's not what this was. This was a component part, a unique component part, being built for one customer whose business essentially failed. And when that business failed under both doctrines, the common law doctrine of commercial frustration and the UCC doctrine of failure of presupposed conditions, under both of those, it's an absolute defense. Thank you very much. All right, please just take another five minutes.